**UNITED STATES DISTRICT COURT**
**NORTHER DISTRICT OF ILLINOIS**

| | |
|---|---|
| JSB FARMS, LLC, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>KOCH INC., F/K/A KOCH INDUSTRIES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER WEVER, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC COMPANY; CANPOTEX LTD.; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES INC.; CF INDUSTRIES NITROGEN, LLC; YARA INTERNATIONAL ASA; and YARA NORTH AMERICA, INC.,<br><br>*Defendants.* | Case. No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, JSB Farms, LLC ("Plaintiff"), acting on its own behalf and representing all other similarly situated indirect buyers of NPK Fertilizers (as defined below), based on personal knowledge of its own circumstances and information gathered through counsel's investigation, files this class action complaint against the defendants listed above, including Koch Inc., f/k/a Koch Industries, LLC; Koch Ag & Energy Solutions, LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC (collectively, "Koch"), Nutrien Ltd. and Nutrien Ag Solutions, Inc. (collectively, "Nutrien"), Canpotex Ltd. ("Canpotex"), The Mosaic Company ("Mosaic"), CF Industries Holdings, Inc., CF Industries Inc., and CF Industries Nitrogen, LLC (collectively, "CF Industries"), and Yara International ASA and Yara North

America, Inc. (collectively, "Yara") (together referred to as the "Defendants"), for violations of federal and state antitrust laws.

## I. OVERVIEW

1. Plaintiff brings this action on behalf of itself individually and of behalf of a plaintiff class consisting of all indirect purchasers of nitrogen fertilizers, phosphorous fertilizers, and potassium ("potash") fertilizers (collectively referred to as "NPK Fertilizers" or "fertilizer") that purchased NPK Fertilizers other than directly from a Defendant or co-conspirator in the United States from at least January 1, 2021 until the present (the "Class Period").

2. This lawsuit arises from Defendants' coordinated efforts to manipulate, increase, stabilize, or artificially maintain the prices of NPK Fertilizers. Defendants – Mosaic, Yara, Nutrien, Canpotex, CF Industries, and Koch – are direct competitors and rank among the largest producers and distributors of NPK Fertilizers in the United States.

3. Defendants allegedly began conspiring to artificially inflate NPK Fertilizer prices as early as January 1, 2021, though the exact start date remains unknown to Plaintiff.

4. Plaintiff seeks to represent all indirect purchasers of NPK Fertilizers in the United States to recover damages caused by Defendants' anticompetitive conduct. The claims include violations of Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §1, and breaches of state antitrust laws. Plaintiff seeks damages, injunctive relief, disgorgement of ill-gotten profits, and reimbursement of litigation costs, including attorneys' fees. As a result of Defendants' price-fixing conspiracy, Plaintiff and other Class members have suffered significant financial harm.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter under 28 U.S.C. §§1331 and 1337(a), Sections 4 and 16 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§15(a) and 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

6. The Court also has supplemental jurisdiction over related state antitrust claims under 28 U.S.C. §1367, as all claims arise from the same set of facts and circumstances.

7. Jurisdiction is further supported by the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), as: (a) the Class includes more than 100 members; (b) at least one Class member is a citizen of a state different from any Defendant; and (c) the aggregated claims of the Class exceed $5,000,000.00, excluding interest and costs.

8. Personal jurisdiction over each Defendant is proper because: (a) each Defendant conducts business across the United States, including in this District; (b) each Defendant sells and distributes NPK Fertilizers nationwide, including in this District; (c) each Defendant maintains substantial and continuous contacts within the United States, including in this District; and (d) each Defendant participated in a conspiracy that caused harm to individuals and businesses in this District.

9. Venue is appropriate in this District under 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b) and (c), as one or more Defendants transact business or have registered agents in this District. Additionally, the CF Industries Defendants are headquartered in this District.

10. Defendants' conduct has significantly impacted interstate commerce by suppressing competition, inflating prices, restricting supply, and harming Class members nationwide.

## III. PARTIES

### A. Plaintiff

11. Plaintiff JSB Farms, LLC is a Minnesota Limited Liability Company located at 11201 17th Place NE, St. Micheal, Minnesota. Each member of JSB Farms, LLC is a citizen of the State of Minnesota.

12. During the Class Period, Plaintiff purchased NPK Fertilizers indirectly from one or more Defendants for its own use and suffered damages due to inflated prices caused by Defendants' antitrust violations. Plaintiff intends to continue purchasing NPK Fertilizers in the future.

### B. Defendants

#### 1. Koch

13. Koch, Inc. is a Kansas corporation headquartered in Wichita, Kansas. In August, 2024, Koch Industries, LLC, announced it had changed its name to Koch, Inc., following a recent acquisition. Koch, Inc. is the surviving entity and successor of a merger with Koch Industries, LLC.

14. Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company headquartered in Wichita, Kansas, and is an indirect wholly owned subsidiary of Koch Industries, Inc. Koch Ag & Energy Solutions, LLC offers fertilizer, agronomic, and other services to its customers. A 2024 press release indicated that it had invested $2 billion in North American fertilizer production facilities and was spending another $3.6 billion to acquire its new plant in Wever, Iowa.

15. Koch Fertilizer Wever, LLC, is a Delaware limited liability company with its principal office in Wichita, Kansas. On August 29, 2024, Koch Ag & Energy Solutions

announced it acquired the Wever, Iowa fertilizer plant from OCI Global for $3.6 billion. Koch Fertilizer Wever, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

16. Defendant Koch Fertilizer, LLC is a Kansas Domestic Limited Liability Company with its principal offices in Wichita, Kansas. Koch Fertilizer, LLC, "and its subsidiaries are collectively one of the world's largest producers and marketers of fertilizers" with the ability "to manufacture, market and distribute more than 13 million metric tons of fertilizer products annually." Koch Fertilizer owns or has interests in fertilizer plants in the United States and Canada, has a global distribution system including state-of-the-art terminals in the United States, and sells fertilizers including ammonia, urea, UAN, phosphate, potash, and sulfur-based products. Koch Fertilizer, LLC, and its affiliates "own or have interests in nitrogen fertilizer plants in the United States" and other locations. Koch Fertilizer, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

17. Defendant Koch Agronomic Services, LLC is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. "Koch Agronomic Services, LLC and other subsidiaries of Koch Fertilizer, LLC have become one of the world's largest networks for manufacturing and marketing value-added fertilizer products." Therefore, Koch Agronomic Services, LLC, is a wholly owned subsidiary of Koch Fertilizer, LLC.

18. This complaint refers to Koch Industries, LLC; Koch, Inc.; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC collectively as "Koch." At all relevant times, Koch sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**2. Mosaic**

19. The Mosaic Company is a Delaware corporation headquartered in Tampa, Florida. Mosaic became one of the largest fertilizer producers in the world when it was formed in October 2004, from the merger of IMC Global and Cargill Inc.'s crop nutrition division. In 2016, Mosaic acquired Vale S.A.'s Vale Fertilizantes business, adding two potash plants in Brazil and Saskatchewan to its operations. Today, Mosaic is a leading producer of potash and Phosphorus Fertilizers in North America.

20. At all relevant times, Mosaic sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**3. Yara**

21. Yara International ASA is a publicly traded company, listed on the Oslo Stock Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara International ASA is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers.

22. Yara North America, Inc. is a wholly owned subsidiary of Yara International ASA. Its headquarters are located at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602. Yara North America, Inc.'s main activities include sales, marketing, and distribution. The company offers a comprehensive portfolio of crop nutrition services including nitrogen-based fertilizers and NPK Fertilizers.

23. This complaint refers to Yara International ASA and Yara North America, Inc. collectively as "Yara." At all relevant times, Yara sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**4. Nutrien**

24. Nutrien Ltd. is a publicly traded Canadian company based in Saskatoon, Saskatchewan. It was formed from Potash Corporation of Saskatchewan Inc. ("PotashCorp"), which the Saskatchewan government established as a public corporation in 1975. After privatizing in 1990, it aggressively expanded by acquiring major U.S. fertilizer companies, including Potash Company of America, Texasgulf Inc., and White Springs Agricultural Chemicals. In 2016, PotashCorp proposed a merger with Agrium, Inc., a major potash producer. The Federal Trade Commission ("FTC") approved the merger in 2018, requiring the divestiture of two Agrium, Inc. facilities that did not produce potash. The merger created Nutrien Ltd., the world's largest potash producer and the second-largest fertilizer company, an entity operating six of Saskatchewan's ten potash mines and holding around 60% of North America's potash capacity.

25. Nutrien Ag Solutions, Inc. is a wholly owned subsidiary of Nutrien Ltd., incorporated in Delaware and located in Loveland, Colorado.

26. This complaint refers to Nutrien Ltd. and Nutrien Ag Solutions, Inc. collectively as "Nutrien." At all relevant times, Nutrien sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**5. Canpotex Limited**

27. Canpotex Ltd. is a private export company and joint venture that is co-owned by Nutrien, Ltd. and Mosaic Canada Corp Nutrition, LP, a subsidiary of Mosaic. Canpotex's principal place of business is located at Suite 700, 409 – Third Avenue South, Saskatoon, Saskatchewan, Canada S7K 5R5. Canpotex is the leading global producer of potash minerals for NPK Fertilizers, holding about 83% of the United States' potash market.

28. At all relevant times, Canpotex sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**6. CF Industries**

29. CF Industries Holdings, Inc. is a publicly traded company listed on the New York Stock Exchange (NYSE: CF) and is headquartered at 2375 Waterview Drive, Northbrook, Illinois 60062. It produces nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom.

30. CF Industries Inc. is a wholly owned subsidiary of CF Industries Holdings, Inc. and was incorporated in Delaware, with its principal place of business also located in Northbrook, Illinois. CF Industries Inc. serves as the primary operating subsidiary of CF Industries Holdings, Inc.

31. CF Industries Nitrogen, LLC, is an agricultural cooperative of which CF Industries Inc. owns approximately 89% and CHS Inc. owns the remaining 11%. CF Industries Nitrogen, LLC is a Delaware corporation with its principal place of business in Northbrook, Illinois.

32. At all relevant times, CF Industries sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**7. Unnamed Co-Conspirators and Other Non-Parties**

33. Several individuals, firms, and corporations not named as Defendants are believed to have worked as co-conspirators with Defendants and contributed to the illegal activities described herein. Defendants are jointly and severally liable for the misconduct of these unnamed co-conspirators.

34. When reference is made to, any act attributed to, a corporation, it means its officers, directors, agents, employees, or representatives entrusted to manage the corporation's affairs carried out the act.

35. Additionally, Defendants are also responsible for acts committed in support of the alleged misconduct by companies Defendants acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Fertilizers in the United States

36. Fertilizer is an essential component of agricultural production in the United States. Modern farming practices rely heavily on three primary macronutrients—nitrogen (N), phosphorus (P), and potassium (K)—collectively known as NPK fertilizers—to support plant development and optimize crop yields. Each nutrient serves a unique biological function, and together they constitute the core of crop nutrition systems. Although their raw materials and production methods differ, all three are critical to successful cultivation.

37. NPK fertilizers may be applied as single-nutrient products or combined into blended or compound formulations containing two or more nutrients in defined proportions. Product labeling typically specifies the nutrient composition, allowing farmers to choose formulations tailored to soil characteristics and crop needs.

38. By 2025, the U.S. fertilizer industry was valued at approximately $30 billion, with projections exceeding $31 billion in 2026. Demand is particularly strong for bulk NPK products.

39. Fertilizer expenditures represent a significant share of farmers' operating costs. Consequently, increases in fertilizer prices directly affect farm profitability. In 2022, fertilizer costs rose as a proportion of total operating expenses, with crops and fertilizer together accounting for more than 40% of farm expenditures.

40. The manufacture and distribution of NPK fertilizers are characterized by substantial capital requirements and high market concentration, resulting in significant barriers to entry. At the same time, farmers have limited ability to substitute away from these inputs, leading to relatively inelastic demand.

**1. Nitrogen Fertilizers**

41. Nitrogen fertilizers primarily consist of nitrogen and include forms such as nitrates, ammonium-based products, ammonium nitrate, and urea. The classification depends on the chemical form of nitrogen present.

42. Production begins with ammonia, synthesized through the Haber-Bosch process. This method combines hydrogen—typically derived from natural gas—with nitrogen obtained from air, under high temperature and pressure conditions using a catalyst, to produce anhydrous ammonia.

43. Ammonia serves as the foundational input for most nitrogen-based fertilizers, including anhydrous ammonia itself, urea, ammonium nitrate, and UAN solutions.

44. Anhydrous ammonia contains approximately 82% nitrogen and vaporizes upon application to soil. Urea is produced through the reaction of ammonia with carbon dioxide, forming ammonium carbamate, which is then dehydrated. Ammonium nitrate results from reacting ammonia with nitric acid. UAN solutions are liquid blends of urea and ammonium nitrate, typically containing 28–32% nitrogen.

45. Due to extensive consolidation within the industry, nitrogen fertilizer production is highly concentrated. During the relevant period, a small group of major producers controlled the vast majority of U.S. output.

46. Together, Koch, CF Industries, Nutrien, and Yara control 82% of the North American fertilizer market for nitrogen:[1]




47. CF Industries is the largest producer of ammonia in the world.[2] CF then sells ammonia as is or upgrades to other products such as urea, urea ammonium nitrate, and ammonium nitrate.

48. Nutrien publicly states that it is the third-largest nitrogen producer in the world and the #2 North American nitrogen producer, with more than 7 million tons of annual gross ammonia nameplate capacity.[3]

**2. Phosphorus Fertilizers**

49. Phosphorus fertilizers are derived from phosphate rock, which is mined and chemically processed to produce usable phosphorus compounds.

---

[1] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wpcontent/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[2] CF Industries, *Products*, available at https://www.cfindustries.com/products.
[3] Nutrien, *Our business: Nitrogen*, available at https://www.nutrien.com/about/our-business/nitrogen.

50. The United States possesses substantial phosphate reserves, primarily located in Florida and North Carolina.

51. After extraction, phosphate rock is treated with acid—most commonly sulfuric acid—to generate phosphoric acid, which is then further processed or combined with ammonia to produce finished fertilizer products.

52. Phosphate mining requires extensive capital investment, technical expertise, regulatory approvals, and long development timelines, creating significant entry barriers.

53. As with nitrogen fertilizers, phosphorus fertilizer production is dominated by a limited number of firms controlling a substantial share of the market.

54. Mosaic controls 67% of the North American phosphate market, and Nutrien controls another 24%, for a combined 91% market share.[4]




[4] Farm Action Fact Sheet: The Fertilizer Sector, *supra*.

### 3. Potassium Fertilizers

55. Potassium fertilizers, commonly referred to as potash, are obtained from underground deposits and are typically marketed as potassium chloride (KCl).

56. A large portion of potash used in the United States is imported, particularly from Canadian mines, where it is extracted using conventional or solution mining techniques.

57. Potash production also involves high fixed costs, regulatory hurdles, and long lead times, further limiting new market entrants.

#### a. Canpotex and the Potash Market

58. Canpotex is a Canadian export organization responsible for coordinating international sales and logistics for potash produced by its member companies.

59. Established in 1972, it functions as a joint marketing entity through which producers distribute potash to customers outside North America.

60. The organization manages an integrated export system that includes rail transport, port facilities, and shipping operations, enabling efficient delivery from Canadian mines to global markets.

61. Canpotex facilitates coordination among its members regarding export volumes, shipping schedules, and other commercial activities. It also collects and maintains detailed market information, including production levels, inventory, demand, and pricing.

62. This structure creates opportunities for participating firms to share sensitive competitive information and align their pricing and supply strategies.

**4. Systemic Consolidation of the North American NPK Fertilizer Market**

63. Over the past several decades, the fertilizer industry has undergone significant consolidation, transforming from a competitive landscape into one dominated by a small number of major players.

64. In earlier decades, dozens of firms operated across nitrogen, phosphate, and potash markets. Over time, mergers, acquisitions, and facility closures reduced the number of participants dramatically, concentrating market power among a few companies.

65. By the 2010s and beyond, a handful of firms controlled large portions of each fertilizer segment, with only a few major producers remaining across the nitrogen, phosphorus, and potash markets.




**B. Defendants' Anticompetitive Conduct**

66. Beginning around 2021, fertilizer prices increased sharply, diverging from historical trends. Prices surged through 2021 and 2022 and remained elevated even after supply disruptions eased, suggesting influences beyond normal market dynamics.

67. During this period, farmers experienced substantial cost increases, significantly raising operating expenses.

**1. Defendants' Conspiracies to Increase NPK Fertilizer Prices**

68. It is alleged that Defendants coordinated actions to restrict output and maintain disciplined production levels. These actions included limiting capacity, delaying expansion projects, managing inventory levels, and avoiding production increases despite rising prices.

69. Under typical market conditions, high prices would incentivize increased production. Instead, supply remained constrained.

70. The persistence of limited supply, combined with high market concentration, supports the inference of coordinated behavior among producers.

71. As a result, fertilizer prices rose steadily over the relevant period.

**2. NPK Fertilizer Prices Moved in Tandem**

72. Since 2020, fertilizer prices have risen steadily—increasing 37% between 2020 and 2025. Fertilizer prices skyrocketed in 2021, with the wholesale fertilizer index increasing more than 60% in comparison to 2020 levels, nitrogen levels increasing 95% and potash jumping over 70%.



73. Pricing data shows similar patterns across nitrogen, phosphorus, and potash products, with synchronized increases, temporary declines, and renewed upward trends.




**Producer Price Index for Fertilizers (2016-2026)**




**Producer Price Index for Nitrogen Fertilizers (2016-2026)**




**Producer Price Index for Phosphorous Fertilizers (2016-2026)**




**Producer Price Index for Potash Fertilizers (2018-2022)**

74. While farmers faced rising costs, producers reported historically high profits.[5]




### a. Nitrogen Fertilizers Price Increases

75. Public filings from Nutrien reflect a marked escalation in nitrogen fertilizer pricing between 2021 and 2022. According to its 2022 disclosures, the company reported average realized prices of roughly $973 per metric ton for ammonia in 2022 compared to approximately $477 in 2021, representing an increase exceeding 100%. Urea prices rose from approximately

[5] Noah Zahn, "*The price of plenty: Fertilizer companies cash in while farmers struggle*," WUSF NPR (June 8, 2023), *available at* https://www.wusf.org/environment/2023-06-08/the-price-of-plenty-fertilizer-companies-cash-in-farmers-struggle.

$478 per metric ton in 2021 to about $696 in 2022, while prices for nitrogen solutions, nitrates, and sulfates increased from approximately $238 to about $402 per metric ton over the same period.[6]

76. Similar trends are evident in disclosures by CF Industries, which reported substantial year-over-year price increases across its nitrogen fertilizer products. Ammonia prices nearly doubled, rising from roughly $452 per metric ton in 2021 to approximately $849 in 2022. Urea prices climbed from about $397 to $574 per metric ton, while UAN solutions rose from roughly $247 to $477 per metric ton. Ammonium nitrate prices also experienced significant growth, increasing from approximately $269 to $480 per metric ton.[7]

77. Upon information and belief, other major nitrogen fertilizer producers implemented comparable price increases across their product lines during the same timeframe.

**b. Phosphorus Fertilizers Price Increases**

78. Financial disclosures from leading phosphorus fertilizer producers likewise demonstrate substantial price increases beginning in 2021 and peaking in 2022.

79. Nutrien reported that its average realized price for phosphate fertilizers in North America rose from approximately $602 per metric ton in 2021 to roughly $806 per metric ton in 2022, reflecting a significant increase.[8]

---

[6] *See* Nutrien, *Management's Discussion & Analysis* (2022), available at https://www.sec.gov/Archives/edgar/data/1725964/000119312523048055/d411297dex9921.pdf.; *see also* Press Release, Nutrien, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023), available at https://www.sec.gov/Archives/edgar/data/1725964/000119312523040355/d450102dex991.htm.

[7] *See* CF Industries Holdings, Inc., Annual Report (Form 10-K) (Feb. 23, 2023), https://www.cfindustries.com/globalassets/cf-industries/media/documents/reports/annual-reports/cf_industries_2023-annual-report.pdf (estimations based on converting CF's reported per-product-ton to metric tons).

[8] *See* Nutrien Ltd., *Nutrien Annual Report 2022, Management's Discussion and Analysis*, at 45-46 (Feb. 16, 2023), https://www.sec.gov/Archives/edgar/data/1725964/000119312523048055/d411297dex9921.pdf (table reporting "Phosphate" net selling prices).

80. Mosaic similarly reported that its average phosphate fertilizer selling price increased from approximately $564 per ton in 2021 to about $804 per ton in 2022, representing a substantial year-over-year gain.[9]

81. More recent disclosures indicate that, following a decline from peak levels, phosphate fertilizer prices began rising again. For example, Nutrien reported an increase in North American phosphate prices from approximately $615 per metric ton in late 2024 to about $677 per metric ton by late 2025.[10] Mosaic reported a comparable upward trend during the same period.[11]

**c. Potash Price Increases**

82. Public financial statements from major producers also reveal significant increases in potash pricing beginning in 2021 and reaching elevated levels in 2022.

83. Nutrien reported that its average realized potash price in North America rose from approximately $317 per metric ton in 2021 to about $667 per metric ton in 2022, more than doubling over that period.[12]

84. Mosaic reported similar pricing trends, with its average potash selling price increasing from roughly $285 per ton in 2021 to approximately $632 per ton in 2022.[13]

---

[9] *See* The Mosaic Company, Annual Report (Form 10-K) at 34 (Feb. 23, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001285785/c177b49b-a7e5-4f2f-afbc-b1fdc9629748.pdf (table showing "Average Selling Price – Phosphates").

[10] *See* News Release, Nutrien Ltd., *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026), https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741.

[11] *See* Press Release, The Mosaic Company, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026), https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf.

[12] *See* Nutrien Ltd., Nutrien Annual Report 2022, *Management's Discussion and Analysis*, at 38-40 (Feb. 16, 2023), https://www.sec.gov/Archives/edgar/data/1725964/000119312523048055/d411297dex9921.pdf (table showing Potash net selling prices).

[13] *See* The Mosaic Company, Annual Report (Form 10-K) at 36-37 (Feb. 23, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001285785/c177b49b-a7e5-4f2f-afbc-b1fdc9629748.pdf (table showing "Average Selling Price – Potash").

85. Subsequent disclosures indicate that, after declining from 2022 prices began increasing again. Nutrien reported price growth from approximately $270 per metric ton in late 2024 to about $305 per metric ton in late 2025.[14] Mosaic likewise reported a notable increase over the same timeframe.[15]

**C. Defendants' Justifications for the Price Increases Are Insufficient**

86. Defendants have attributed the sharp rise in fertilizer prices during the Class Period to factors such as inflationary pressures, supply chain disruptions, and geopolitical instability, including the conflict in Ukraine and related sanctions affecting exports from Russia and Belarus.

87. However, these explanations do not adequately account for the persistence and magnitude of the elevated prices experienced by purchasers.

88. Following the 2022 invasion of Ukraine, producers outside sanctioned regions had the opportunity to expand output and capture additional market share. In a competitive environment, such expansion would be expected to exert downward pressure on prices. Instead, prices remained elevated, suggesting that producers did not respond in a manner consistent with competitive market incentives.

89. Moreover, when U.S. sanctions on Belarusian potash were lifted in late 2025, the anticipated increase in supply did not result in meaningful price reductions, further undermining Defendants' stated justifications.

---

[14] *See* News Release, Nutrien Ltd., *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026), https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741 .

[15] *See* Press Release, The Mosaic Company, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026), https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf.

90. Similarly, trends in input costs do not explain sustained high prices for nitrogen fertilizers. Even during periods of relatively low natural gas prices—a key input—fertilizer prices remained elevated.[16]

91. Rather than declining in response to easing cost pressures, fertilizer prices remained persistently high throughout the Class Period, even as broader commodity markets softened.

92. Industry communications and reports have further suggested that available production capacity existed but was not fully utilized, calling into question claims of supply shortages.

**D. The Fertilizer Industry Has Faced Scrutiny in the Past**

93. The fertilizer sector has a history of regulatory and legal scrutiny relating to alleged anticompetitive conduct, including investigations into coordinated pricing behavior.

94. In 2008, a class action lawsuit was filed alleging that global potash producers conspired to restrict output and inflate prices. The claims survived dismissal and were later affirmed on appeal.

95. The litigation ultimately resulted in settlements totaling nearly $100 million, with several major producers agreeing to substantial payments to resolve the allegations.

96. Subsequent analyses by antitrust experts have continued to highlight the susceptibility of fertilizer markets to coordinated conduct, particularly given their concentrated structure and the role of joint marketing organizations.

---

[16] RealAgriculture Market Team, *Sticky input prices and short supplies: What's keeping fertilizer costs high?* (Aug. 28, 2025), https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

### E. Federal Government Investigates Collusion and Price Fixing of NPK Fertilizers

97. In late 2025, Mark Mueller, President of the Iowa Corn Growers Association ("ICGA"), spoke at a U.S. Senate Committee hearing to discuss competition in the seed and fertilizer industries. He testified that rising fertilizer costs were causing significant financial strain on farmers across the country, emphasizing that they faced an impossible choice—to either "buy fertilizer or stay solvent."[17]

98. Mueller's testimony highlighted the role of market concentration in driving price increases and noted the growing disparity between fertilizer costs and farm revenues. He blamed the significant price increases on the consolidation of the fertilizer industry, which has resulted in just a few companies that have a monopoly and dominate the market.[18]

99. The federal government has taken steps to investigate these allegations of monopoly power and price fixing in the industry. President Trump issued an Executive Order in December 2025 to create a Food Supply Chain Security Task Force, tasking the U.S. Attorney General and the Chairman of the FTC to investigate price-fixing and other anti-competitive practices in the food sector.[19]

100. The United States Department of Justice announced on March 4, 2026 that it has launched an investigation into whether major fertilizer producers engaged in coordinated conduct in violation of antitrust laws. The investigation focuses on CF Industries Holdings Inc., Nutrien

---

[17] U.S. Senate Committee on the Judiciary, Hearing on Competition Issues in the Seed & Fertilizer Industries – Written Testimony of Mark Mueller, President of the Iowa Corn Growers Association (Oct. 28, 2025), https://www.grassley.senate.gov/download/mark-mueller-testimony-senate-judiciary-committee-submitted-version.
[18] *Id.*
[19] The White House, *Addressing Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain* (Dec. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/addressing-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.

Ltd, The Mosaic Company, Koch Inc., and Yara International ASA, which collectively control most of the nitrogen fertilizer sold in the United States.[20]

### F. NPK Fertilizer Prices Surged During the Class Period, While Input Costs and Demand Declined

101. Historically, fertilizer price increases have tended to be temporary, with market forces eventually restoring equilibrium. During the Class Period, however, prices rose sharply and remained elevated.

102. Beginning in 2024, prices across nitrogen, phosphorus, and potash products began increasing once again after a brief period of decline.

103. These price increases cannot be fully explained by changes in input costs or other macroeconomic factors. For example, profit margins expanded significantly even when production costs rose at a much slower rate.

104. Financial results from major producers show substantial profit growth during this period, indicating that elevated prices translated into increased earnings.

105. The repeated pattern of synchronized price movements across distinct fertilizer categories suggests coordinated behavior rather than independent decision-making.

106. Given the differences in production methods and inputs among nitrogen, phosphorus, and potash products, such parallel pricing trends would not typically be expected in a competitive market.

[20] *See* Frank DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion*, Yahoo!finance (March 4, 2026), https://finance.yahoo.com/news/justice-department-probesfertilizer-giants-192006014.html (last visited April 30, 2026); Rob Williams, *Justice Department Investigates Fertilizer Producers Over Possible Price Collusion*, Seeking Alpha (March 4, 2026), https://seekingalpha.com/news/4560887-justice-department-investigates-fertilizer-producersover-possible-price-collusion (last visited April 30, 2026).

### G. "Plus Factors" Support an Inference of Collusion

107. Antitrust analysis identifies certain economic indicators—commonly referred to as "plus factors"—that support an inference of coordinated conduct beyond mere parallel behavior.

108. Several such indicators are present here, including the exchange of sensitive information, high market concentration, significant entry barriers, opportunities for coordination, and the commodity nature of the products.

109. For example, joint marketing arrangements and industry organizations facilitate the sharing of information regarding production, pricing, and demand.

110. The high level of concentration across fertilizer markets further enhances the ability of firms to coordinate behavior.

111. Measures of market concentration, such as the Herfindahl-Hirschman Index, indicate that these markets are highly concentrated under federal antitrust guidelines.

112. Industry participants have also attributed elevated prices to consolidation and reduced competition.

113. Significant barriers to entry limit the ability of new competitors to disrupt existing pricing dynamics.

114. Industry events and trade associations provide opportunities for interaction among competitors, increasing the risk of coordinated conduct.

115. Participation in shared data platforms and governance structures further facilitates information exchange.

116. Finally, the homogeneous nature of fertilizer products makes price the primary basis of competition, increasing the likelihood of coordinated pricing behavior.

## V. ANTI-COMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKETS

117. Defendants' conduct has produced significant anticompetitive consequences, including but not limited to the suppression of competition in the market for NPK fertilizers, the maintenance of prices at artificially inflated levels, and the deprivation of purchasers of the benefits of a competitive marketplace.

118. As a direct and proximate result of Defendants' unlawful actions, purchasers were denied the advantages of open competition and instead paid prices for NPK fertilizers that exceeded those that would have prevailed under competitive conditions. Plaintiff and members of the Class have therefore sustained injury in the form of overcharges. Such harm is precisely the type of injury the antitrust laws are designed to prevent. The alleged conduct constitutes a per se violation of antitrust principles or, alternatively, is unlawful under a rule-of-reason or quick-look analysis.

119. Empirical research has shown that participants in fertilizer-related cartels have historically imposed substantial overcharges, often exceeding those observed in other industries. These findings underscore the fertilizer sector's vulnerability to coordinated pricing conduct and the resulting harm to purchasers.

120. Although proof of a relevant market is not required under a per se theory, Plaintiff provides such definitions in the alternative should a more detailed competitive analysis be applied.

### A. The Relevant Product Market Is NPK Fertilizers

121. The appropriate product market consists of NPK fertilizers as a whole.

122. NPK fertilizers lack reasonable substitutes, as each of the three nutrients is essential for plant growth. Alternatively, separate submarkets exist for nitrogen fertilizers, phosphate fertilizers, and potash, each of which constitutes a distinct product market.

**B. The Relevant Geographic Market Is the United States**

123. The relevant geographic market is the United States, where Defendants distribute and sell NPK fertilizers and where purchasers experience the effects of Defendants' conduct.

## VI. CLASS ALLEGATIONS

124. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and similarly situated entities, defined as follows:

> (a) **Nationwide Class:** Pursuant to Federal Rule 23(b)(1) and (2) and seeking equitable and injunctive relief, Plaintiff brings this suit on his behalf and on behalf of a proposed class of all persons or entities that indirectly purchased NPK fertilizers during the Class Period from Defendants or their affiliates, subsidiaries, or agents.

> (b) **State Law Damages Class:** Pursuant to Federal Rule 23(b)(3) and seeking damages pursuant to state antitrust and consumer protection laws, as well as common law unjust enrichment, Plaintiff brings this suit on his behalf and on behalf of a proposed class of all other similarly situated persons consisting of all persons or entities that indirectly purchased NPK fertilizers within the Indirect Purchaser States during the Class Period from Defendants or their related entities.

125. Excluded from the Class are Defendants and their corporate affiliates, including parents, subsidiaries, and successors, as well as their officers, directors, and employees. Also excluded are judicial officers assigned to this matter and their immediate family members.

126. This action is properly maintainable as a class action under Rule 23.

127. **Numerosity (Rule 23(a)(1)):** The Class is sufficiently large that joinder of all members would be impracticable. The Class likely includes thousands of purchasers whose identities can be determined through Defendants' records and distribution channels.

128. **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)):** Common questions of law and fact predominate over individualized issues, including:

a. the boundaries of the relevant product market;

b. Defendants' market power;

c. whether Defendants shared competitively sensitive information;

d. whether Defendants engaged in agreements to fix or stabilize NPK fertilizer prices;

e. whether such conduct extended to nitrogen fertilizers;

f. whether such conduct extended to phosphate fertilizers;

g. whether such conduct extended to potash;

h. the duration and scope of the alleged conspiracy;

i. whether Defendants' actions violated antitrust laws;

j. whether Plaintiff and Class members suffered injury;

k. whether overcharges occurred in NPK fertilizer purchases;

l. whether overcharges occurred in nitrogen fertilizer purchases;

m. whether overcharges occurred in phosphate fertilizer purchases;

n. whether overcharges occurred in potash purchases;

o. the appropriate method for calculating damages on a class-wide basis; and

p. the appropriate form of injunctive relief.

129. **Typicality (Rule 23(a)(3)):** Plaintiff's claims are representative of those of the Class, as all members were subjected to the same alleged conduct and suffered similar economic harm in the form of inflated prices.

130. **Adequacy (Rule 23(a)(4)):** Plaintiff will fairly and adequately protect the interests of the Class, as there are no conflicts between Plaintiff and other Class members. Plaintiff has retained experienced counsel and intends to vigorously prosecute this action.

131. **Superiority (Rule 23(b)(3)):** A class action is the most efficient and practical method for resolving these claims, as individual litigation would be costly and inefficient. Class treatment avoids duplicative proceedings and promotes judicial economy.

132. Proceeding on a class basis allows similarly situated individuals to pursue their claims collectively, ensuring consistent adjudication and reducing unnecessary expense.

133. Plaintiff is not aware of any obstacles that would prevent this case from being effectively managed as a class action.

134. **Injunctive Relief (Rule 23(b)(2)):** Defendants have acted on grounds generally applicable to the Class, making injunctive relief appropriate to address the alleged misconduct on a class-wide basis.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

135. The applicable statute of limitations has been tolled due to Defendants' concealment of their unlawful conduct. As a result, Plaintiff and Class members were unable to discover their claims despite the exercise of reasonable diligence.

136. In addition, the continuing nature of Defendants' conduct restarts the limitations period with each overt act. Throughout the Class Period, Defendants repeatedly sold NPK fertilizers at artificially inflated prices pursuant to their ongoing scheme.

137. These acts constitute independent and ongoing conduct, not merely the continuation of past behavior. Each act further advanced the alleged conspiracy and caused additional harm to purchasers.

138. In the context of a price-fixing conspiracy, each transaction at an inflated price gives rise to a new cause of action. Accordingly, each sale of NPK fertilizer at a supra-competitive price restarts the statute of limitations, regardless of when the underlying conspiracy began.

## VIII. CAUSES OF ACTION

**COUNT I**
**Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Sections 4 and 16 of the Clayton Act**
**(Nationwide Indirect-Purchaser Class for Injunctive Relief Against All Defendants)**

139. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

140. At least as early as January 1, 2020, and continuing through the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for NPK Fertilizers in the United States to supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

141. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of NPK Fertilizer and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

142. These restraints affect the relevant markets: (a) NPK Fertilizers; (b) alternative submarkets including, but not limited to, Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash; and (c) the United States.

143. As a direct and proximate result, Plaintiff and members of the Class have suffered antitrust injury, and damages to their business or property, including by paying overcharges of and supracompetitive prices for NPK Fertilizer and loss of competitive benefits, and will continue to be injured absent injunctive relief.

144. Defendants' anticompetitive conduct had the following effects, among others:

a. competition among Defendants has been restrained or eliminated with respect to NPK Fertilizer prices;

b. the prices of NPK Fertilizer have been fixed, stabilized, or maintained at artificially high levels; and

c. Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

145. Defendants' conduct lacks legitimate procompetitive justifications and affects as substantial volume of interstate commerce, as NPK Fertilizer is marketed and sold nationwide. As such, Defendants' conduct is unlawful under the per se standard, as well as under the "quick look" and rule-of-reason analyses. Moreover, even if there were valid procompetitive justifications, such justifications could have been achieved through reasonable, less restrictive competitive endeavors.

146. Pursuant to the Clayton Act, 15 U.S.C. §§15 and 26, on behalf of members of the Indirect Purchaser Class, Plaintiff is entitled to and seeks injunctive relief to enjoin Defendants' ongoing violations, and attorneys' fees and costs against Defendants.

## VIOLATIONS OF STATE ANTITRUST LAWS

### COUNT II
### Violations of Illinois Brick Repealer State Antitrust Statutes
### (On behalf of the State Law Damages Class Against All Defendants)

147. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

148. The following Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiff and members of the State Law Damages Class.

149. Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

150. By engaging in the foregoing conduct, Defendants violated the following states' antitrust laws:

- Alabama under Ala. Code §6-5-60, *et seq.*;
- Arizona under Ariz. Rev. Stat. Ann. §44-1401, *et seq.*;
- California under Cal. Bus. & Prof. Code §16750, *et seq.*;
- Colorado under Colo. Rev. Stat. Ann. §6-4-101, *et seq.*;
- District of Columbia under D.C. Code Ann. §28-4501, *et seq.*;
- Florida under Fla. Stat. §542.15, *et seq*.;
- Hawaii under Haw. Rev. Stat. Ann. §480-1, *et seq.*;
- Illinois under 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*;
- Iowa under Iowa Code Ann. §553.1, *et seq.*;
- Kansas under Kan. Stat. § 50-101, et seq.;
- Maine under Me. Stat. tit. 10 §1101, *et seq.*;
- Michigan under Mich. Comp. Laws Ann. §445.771, *et seq*.;
- Minnesota under Minn. Stat. Ann. §325D.49, *et seq.*;
- Mississippi under Miss. Code. Ann. §75-21-1, *et seq.*;
- Nebraska under Neb. Rev. Stat. Ann. §59-801, *et seq.*;
- Nevada under Nev. Rev. Stat. §598A.010, *et seq.*;
- New Mexico under N.M. Stat. Ann. §57-1-1, *et seq.*;
- New York under N.Y. Gen. Bus. Law §340, *et seq.*;

- North Carolina under N.C. Gen. Stat. Ann. §75-1, *et seq.*;
- North Dakota under N.D. Cent. Code Ann. §51-08.1-01, *et seq.*;
- Oregon under Or. Rev. Stat. Ann. §646.705, *et seq.*;
- South Dakota under S.D. Codified Laws §37-1-3.1, *et seq.*;
- Tennessee under Tenn. Code Ann. §47-25-101, *et seq.*;
- Vermont under Vt. Stat. Ann tit. 9, §2451, *et seq.*;
- West Virginia under W. Va. Code Ann. §47-18-1, *et seq*.; and
- Wisconsin under Wis. Stat. Ann. §133.01, *et seq*.

## IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant judgment on Plaintiff's behalf and on behalf of the Classes herein against Defendants, as follows:

1. That this action be certified as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2); that Plaintiff be appointed as Class Representative; and that Plaintiff's counsel be appointed as Class Counsel to represent the proposed Class.

2. Plaintiff and the members of the State Law Damages Class recover damages, to the maximum extent allowed under such laws, and that a judgment in favor of Plaintiff and the Class members be entered against Defendants in an amount to be trebled to the extent such laws permit.

3. On behalf of Plaintiff and the Nationwide and State Law Damages Classes, a permanent injunction that Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the conduct alleged herein, or from entering into any other contract or engaging in any other conduct having a similar purpose or effect, and from

adopting or following any practice, plan, program, or device having a similar purpose or effect.

4. Plaintiff and State Law Damages Class members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint.

5. Plaintiff and all Class members recover their costs of suit, including reasonable attorneys' fees and costs, as provided by law.

## X. JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Dated: May 18, 2026

Respectfully submitted,

*/s/ Charles R. Watkins*
Charles R. Watkins
GUIN & EVANS, LLC
805 Lake St. #226
Oak Park, IL 60301
Phone: (312) 878-8391
cwatkins@guineveans.com

Garrett D. Blanchfield (*pro hac vice forthcoming*)
Brant D. Penney (*pro hac vice forthcoming*
Roberta A. Yard (*pro hac vice forthcoming*)
REINHARDT WENDORF & BLANCHFIELD
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Phone: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Attorneys for Plaintiff and the Proposed Classes*